ALEXANDER C. HAGERTHY et al., vs. JOHN P. WEBBER.

Hancock.    Opinion June 27, 1905.

*Mortgage. Redemption. Books of Deceased Surveyor. Evidence. R. S. (1883), c. 90, § 22; 1903, c. 92, § 23.*

1.  It is provided by section 23 of chapter 92, R. S. 1903, relating to mortgages of real estate, that " the person to whom money is tendered to redeem such lands, if he receives a larger sum than he is entitled to retain, shall refund the excess." ·

2.  November 17, 1881, Henry M. Hall and Barlow Hall, Jr., in consideration of $12,000, conveyed to Fayette Shaw, William Shaw and Brackley Shaw by deed of warranty " the hemlock trees standing on and growing upon " the south half of township No. 2, in the county of Penobscot with certain exceptions therein named " with the right to enter and cut down the trees and peel the bark from them " . . . . " reserving however, to said Hall & Hall, the right to carry away all of said hemlock trees after the same are cut down and the bark peeled therefrom."

3.  The next day, November 18, 1881, the Shaws gave to Hall & Hall a mortgage deed of " the same hemlock trees standing and growing which. the said Hall & Hall conveyed to us by deed dated November 17, 1881 " conditioned that not more than 12,000 cords of bark should be peeled and removed by the Shaws from the land described, that no bark should be peeled and removed by them after the first day of May, 1897, and that within a reasonable time thereafter they would convey to Hall & Hall by quitclaim deed the hemlock trees standing and growing on the land at that date.

4.  On the same day, November 18, 1881, Hall & Hall gave to the Shaws a mortgage of the land upon which the hemlock trees were standing, to secure the payment of $2000, with interest from the ——— day of ——— 1881, " according to a certain agreement between the parties dated November 17, 1881, . . . " which will explain the terms and conditions upon which the two thousand dollars and interest is to be paid by said Hall & Hall to said Shaws." The plaintiffs succeeded to the rights of Hall & Hall and the defendant to the rights of the Shaws.

5.  The written agreement referred to in the mortgage of the land was never recorded, and although executed in duplicate, neither party was able to produce a copy of it as evidence at the trial. But it was satisfactorily shown that " it limited or explained the mortgage for $2000, and provided in substance that if the bark on this tract fell short of the 12,000 cords mentioned in the deed, this mortgage should be good for the deficiency

VOL. C 20

up to the amount of $2000.00 or 2000 cords, which would be the same thing, with interest on the $2000.00 from the date when the Shaws paid the money to the Halls up to the time of the return of the money."

6. The defendant received from the plaintiffs the sum of $2795.96 to redeem from this mortgage the lands in question, but the jury evidently found that the defendant was not entitled to retain any part of that sum, and accordingly rendered a verdict for the plaintiffs for the entire amount.

7. The presiding Justice instructed the jury "that if there were 12,000 cords of bark upon this tract of land during the period of fifteen years, which it was practicable for the Shaws to have taken off, or the Shaws or their successors to have taken off within the period of fifteen years up to May 1, 1897, that then that would be the end of this case, and nothing would be due upon the mortgage, and the plaintiffs would be entitled to recover." *Held :* that this instruction was correct.

8. The scale books of William Watts, a deceased scaler, were admitted in evidence. *Held :* that these books were competent evidence for the consideration of the jury as tending to prove the quantity of bark taken off the tract in question. This was the important purpose for which the books were kept, and the entries in them are original evidence and the best evidence obtainable to prove the facts therein stated.

On motion and exceptions by defendant.    Overruled.

Assumpsit brought under R. S. 1883, chapter 90, section 22,— now R. S. 1903, chapter 92, section 23,— to recover money alleged to have been paid by the plaintiffs to redeem from a certain real estate mortgage, held by the defendant, in excess of the amount actually due on said mortgage.    The verdict was for the plaintiffs, and the defendant filed a general motion for a new trial.    The defendant also took exceptions to the admission of the scale books of William Watts, a deceased surveyor.

The case is sufficiently stated in the opinion.

*A. W. King* and *John A. Peters, Jr.,* for plaintiffs.

*L. B. Deasy* and *Appleton & Chaplin,* for defendant.

SITTING :  WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

WHITEHOUSE, J.   It is provided by sect. 23, of ch. 92, R. S., relating to mortgages of real estate, that "the person to whom money is tendered to redeem such lands, if he receives a larger sum than he is entitled to retain, shall refund the excess."

The defendant received from the plaintiffs the sum of $2795.96 to redeem from mortgage the lands in question in this case, but the jury evidently found that the defendant was not entitled to retain any part of that sum, and accordingly rendered a verdict for the plaintiffs for the entire amount. The case comes to this court on motion and exceptions.

November 17, 1881, Henry M. Hall and Barlow Hall, Jr., in consideration of $12,000, conveyed to Fayette Shaw, William Shaw and Brackley Shaw by deed of warranty "the hemlock trees standing on and growing upon" the south half of township No. 2, in the county of Penobscot with certain exceptions therein named "with the right to enter and cut down the trees and peel the bark from them" . . . . "reserving, however, to said Hall and Hall, the right to carry away all of said Hemlock trees after the same are cut down and the bark peeled therefrom."

The next day, November 18, 1881, the Shaws gave to Hall & Hall a mortgage deed of "the same hemlock trees standing and growing which the said Hall & Hall conveyed to us by deed dated November 17, 1881," conditioned that not more than 12,000 cords of bark should be peeled and removed by the Shaws from the land described, that no bark should be peeled and removed by them after the first day of May, 1897, and that within a reasonable time thereafter they would convey to Hall & Hall by quitclaim deed the hemlock trees standing and growing on the land at that date.

On the same day, November 18, 1881, Hall & Hall gave to the Shaws a mortgage of the land upon which the hemlock trees were standing, to secure the payment of $2000, with interest from the ———— day of ———— 1881, "according to a certain agreement between the parties dated November 17, 1881, . . . . "which will explain the terms and conditions upon which the two thousand dollars and interest is to be paid by said Hall & Hall to said Shaws." The plaintiffs succeeded to the rights of Hall & Hall and the defendant to the rights of the Shaws.

The written agreement thus referred to in the mortgage of the land was never recorded, and although it appears to have been executed in duplicate, each party made unavailing search for it, and no copy of

it was produced as evidence at the trial. The substance of it, however, is satisfactorily shown by the deposition of C. W. Clement, a witness for the plaintiffs and by the testimony of the defendant John P. Webber. Mr. Clement says, "it limited or explained the mortgage for $2000, and provided in substance that if the bark on this tract fell short of the 12,000 cords mentioned in the deed, this mortgage should be good for the deficiency up to the amount of $2000.00, or 2000 cords which would be the same thing, with interest on the $2000.00 from the date when the Shaws paid the money to the Halls up to the time of the return of the money." In answer to special interrogatories, Mr. Clement further deposed as follows:

Q. Referring to the substance of this agreement and its terms, suppose there were 12,000 cords of bark on the Town or the Hall strip we have referred to at the time of the sale by the Halls to the Shaws, what, if anything, would be due and payable under this mortgage.

A. Nothing.

Q. Referring again to the terms of this agreement what would have been due and payable under this agreement if there had been say only 11,000 cords of bark on the town at the time of the sale from the Halls to the Shaws?

A. The amount secured by the mortgage in that case would be One Thousand Dollars and interest, and the amount due and payable under the agreement would have been $1000 and interest.

Q. Referring to this agreement what would have been due under the mortgage, by the terms of the agreement, if there had been found to be less than 10,000 cords of bark on the strip?

A. The mortgage would have secured to the Shaws the return of $2000 and interest thereon, and no more.

Q. Did any difference of opinion between you and Mr. Webber occur when you and he were reading and discussing the terms and meaning of this contract or paper?

A. None that I recollect.

The testimony of John P. Webber upon this point is as follows:

Q. You saw the agreement referred to in this mortgage at the time you bought the mortgage, as you say, of Mr. Clement?

A.  Yes, I did.

Q.  You and Mr. Clement had the agreement?

A.  Yes.

Q.  And looked it over?

A.  Yes.

Q.  And considered its terms and provisions?

A.  Yes.

Q.  At your office?

A.  Yes.

Q.  Substantially as he has testified in his deposition?

A.  I think so; yes sir.

Q.  You understood, did you not, that if they had taken off or should take off 12,000 cords of bark within the period of fifteen years provided in the agreement, that that would end the mortgage?

A.  Yes, I did; I understood it so.

Q.  You also understood, did you not, that if there was bark enough on the town so that they could have it taken off within the fifteen years it would have ended the mortgage?

A.  Yes, if they could have done it. If they could have got the bark.

Q.  You understood that at the time you bought?

A.  Yes, sir.

Upon this state of the evidence, the presiding Justice instructed the jury as follows:

"The defendant's counsel claims that it is incumbent upon the plaintiffs to show that there was 12,000 cords of merchantable bark practicable to be taken in 1881 when this agreement was made. I shall not give you exactly that rule. Under the deed and the mortgages and the agreement, as it has been testified to before you, I instruct you that if there were 12,000 cords of bark upon this tract of land during the period of fifteen years, which it was practicable for the Shaws to have taken off, or the Shaws or their successors to have taken off during the period of fifteen years up to May 1, 1897, that then that would be the end of this case, and nothing would be due upon the mortgage, and the plaintiffs would be entitled to recover. That is if the hemlock which was upon this lot in November, 1881,

had grown from year to year so that more bark had become merchant-
able from year to year or suitable to take off for tanning purposes,
and it was practicable for the Shaws or their successors to have taken
this bark off during this period, 12,000 cords of it, then that would
satisfy the conditions of this mortgage, and nothing would be due
upon the mortgage, and the mortgage would be fully paid, and the
plaintiffs would be entitled to recover."

This instruction was undoubtedly correct. It simply sustained
and enforced the agreement of the parties according to the manifest
intention disclosed by the terms of the mortgage of the hemlock trees
from the Shaws to the Halls, the terms of the $2000 mortgage of the
land from the Halls to the Shaws, and the unrecorded agreement ·
therein referred to and described. The defendant frankly admits
that at the time he made the purchase he understood that if 12,000
cords of bark could have been taken off of the land during the period
of fifteen years provided in the agreement, "that fact would have
ended the mortgage;" and it is evident that Mr. Clement, the plain-
tiff's witness did not intend to give any different view of it. In
response to the counsel's general request to state the substance of the
agreement he says: "It provided in substance that if the bark on
this tract fell short of the 12,000 cords mentioned in the deed, this
mortgage would be good for the deficiency up to the amount of
$2000 or 2000 cords." But the only "deed" in which "the 12,000
cords are mentioned" is the mortgage deed which allows fifteen years
for the growth and removal of the "12,000 cords mentioned." It
is true that in one of the subsequent inquiries put by counsel for the
purpose of emphasizing and illustrating the fact that this agreement
contained no stipulation for the payment of any sum of money "abso-
lutely, and at all events," this special phase of the subject does not
appear to have been present to the mind of counsel in framing the
question and no express reference is made either in the question or
answer to the period of fifteen years within which the bark could be
removed; but when all parts of Clement's deposition are considered
together, in view of the fact that after fully discussing all of the terms
of the agreement, he and the defendant were in perfect accord upon
the proposition that if 12,000 cords of bark could have been peeled

and removed before May 1, 1897, the mortgage would have been satisfied, it is evident that reference in this interrogatory to the "11,000 cords of bark on the town at the time of the sale from the Halls to the Shaws" meant the bark then on the town and its natural growth and increase during the period allowed for its removal. See *Donworth* v. *Sawyer*, 94 Maine, 242. It appears from the testimony of both Clement and the defendant that the agreement examined and discussed by them was plain and easily understood, and their prompt concurrence as to the substance and effect of its terms is more satisfactory evidence of the contents of the paper than any inadvertent forms of expression employed by counsel in preparing the interrogatories for Clement's deposition. It is inconceivable that the defendant Webber, would have been so readily convinced of the effect of the agreement if it had spoken upon this point with any uncertain sound.

With respect to the motion it is earnestly contended in the first place that the verdict is not warranted by the evidence for the reason that the money received by the defendant, which the plaintiffs seek to recover in this action, is clearly shown by the evidence to have been paid by the plaintiffs for the purpose of compromising and finally settling a disputed mortgage debt, and that the defendant is therefore entitled to retain all that he received, although it might subsequently appear to be more than was actually due. It is said that there appeared to be a deficiency of much more than 2000 cords of bark, that according to the face of the mortgage, the amount due the defendant with interest from November, 1881, was forty-five hundred dollars and that there was no apparent reason for accepting $1700 less than the amount claimed to be due, except to avoid litigation by means of a compromise settlement.

It is urged that the correspondence between the parties and all the circumstances conclusively show that both the defendant and his son, Charles P. Webber, understood that they were making a final settlement by discounting the interest prior to Nov. 6, 1896, and agreeing to accept $2000 and interest after that date. It is also insisted that there is a preponderance of evidence in favor of the defendant's contention that at the time the money was delivered to Chas. P. Webber, the defendant's son, there was no intimation by plaintiffs' counsel

of any purpose to bring suit to recover the money thus paid.

On the other hand, the plaintiffs' counsel calls attention to the significant fact that instead of remitting the sum of $2795.96, by check, as he was authorized to do by the defendant's letter, the plaintiff, Giles, went to Bangor with his attorney, Mr. King, and paid the defendant the full sum of $2795.96 in bank bills which he carried from Ellsworth in a satchel for that purpose. It is insisted that this extraordinary proceeding was entirely irreconcilable with 'the defendant's theory that the parties had previously agreed upon a definite sum to be accepted by the defendant as a final settlement by way of compromise. Attention is also called to the positive testimony of Mr. Giles that at the time of the delivery of the bank bills to the defendant's agent, Chas. P. Webber, it was distinctly stated to Mr. Webber by Mr. King, the plaintiff's attorney, that according to their claim there was nothing due under the mortgage, that the money was paid under protest, and that an action would be commenced to recover it back. Mr. C. P. Webber, and his stenographer, it is true, testified that no such statements were made by Mr. King, but the jury saw the witnesses and doubtless considered their testimony in connection with the improbability that Mr. King would thus deliberately participate in such a compromise adjustment and immediately thereafter repudiate the settlement and commence an action to recover the money. But no useful purpose can be subserved by reviewing in detail the forty-four pages of testimony relating to this branch of the case. It is only necessary to say that there was sufficient evidence to warrant the finding of the jury and that the court would not be justified in disturbing the verdict on this ground.

But it is further contended in behalf of the defendant that if the scale books of William Watts, a deceased surveyor, were admissible evidence, it does not satisfactorily appear from the books themselves or any other testimony in the case, that the bark surveyed according to those records was taken from that part of the south half of lot No. 2, included in the mortgage, and that without this testimony there was not sufficient evidence as to the quantity of the bark to sustain the verdict.

These books were undoubtedly admissible evidence. *Kennedy* v.

*Doyle,* 10 Allen, 167; *Dow* v. *Sawyer,* 29 Maine, 117; *Pike* v. *Crehore,* 40 Maine, 503; 1 Green Ev. (15 Ed.), sects. 115 & 116.

It also satisfactorily appears from the testimony that the Halls did not own any other land in township No. 2, except the tract from which the bark was sold to the Shaws, that during this period the Halls did not have any other bark operation except upon this tract, nor any other bark contract connected with this tract except this one with the Shaws, and that Watts was the scaler and measurer of bark for the Halls. The entries also contain the name of the Shaws' surveyor, thus tending to show that the bark was taken off in connection with the Shaw contract. The books were competent evidence for the consideration of the jury as tending to prove the quantity of bark taken off of the track in question. This was the important purpose for which these books were kept, and the entries in them are original evidence and the best evidence obtainable to prove the facts therein stated.

It is accordingly the opinion of the court that the entry must be

*Motion and exceptions overruled.*